Elliot J. Siegel (Bar No. 286798)
elliot@kingsiegel.com
Julian Burns King (Bar No. 298617)
julian@kingsiegel.com
Brent R. Boos (Bar No. 292808)
brent@kingsiegel.com
**KING & SIEGEL LLP**
724 South Spring Street, Suite 201
Los Angeles, California 90014
tel: (213) 465-4802
fax: (213) 465-4803

Attorneys for Plaintiffs and the Putative Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Bradford Hogge**, individually and on behalf of all similarly situated individuals; **Natalie Hilburg,** individually and on behalf of all similarly situated individuals; and **Tatiana Burnett**, individually and on behalf of all similarly situated individuals,

Plaintiffs,

vs.

**Tushy, Inc.**, a Delaware corporation; and **Does 1-10**, inclusive;

Defendants.

CASE NO. 2:25-cv-10419-SVW-SK

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1) **Violation of California's False Advertising Law (Bus. & Prof. Code §§ 17500, et seq.);**
2) **Violation of California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.); and**
3) **Violation of California's Unfair Competition Law (Bus. & Prof. Code §§ 17200, et seq.)**

**Demand for Jury Trial**

Complaint Filed: October 29, 2025

Plaintiffs Bradford Hogge, Natalie Hilburg, and Tatiana Burnett, by and through their counsel of record, bring this action on behalf of themselves and all other similarly situated consumers and allege as follows:

## INTRODUCTION

1. "[R]eference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product."[1]

2. Empirical research indicates that "[i]nflated reference prices can […] increase consumers' value perceptions […], reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products."[2]

3. Indeed, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[3] One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price."[4]

4. The temptation to advertise false discounts off fake reference prices is significant for retailers, who can increase both sales volume and pricing by simply advertising that their products, or similar products, regularly sell for more than they really do.

5. While offering legitimate discounts to achieve these results is a valid form of competition, offering fake ones—with fictitious "reference prices" and/or expiration

---

[1] *See* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, J. of Applied Bus. Research 6, no. 1, pp. 65-66 (1990); *see also* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118 (1994) ("reference to a retailer's normal or regular price in retail sale prices advertising provides the consumer with information used to determine perceived value").

[2] Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

[3] *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, *supra*, at p. 66.

[4] *Id.*

dates—is deceptive, illegal, and harmful to consumers.[5]

6. Defendant has engaged in a textbook example of this unsavory practice. By advertising its products with discounts off higher reference prices, and representing those reference prices as regular prices, Defendant increases the perceived value of its products to consumers, making it more likely that consumers will buy Defendant's products, buy them sooner rather than later, and pay higher prices for them.

7. For years, Defendant never actually sold its products for their advertised reference prices – nor were its products sold anywhere else in the marketplace for their reference prices.

8. These illusory discounts are anti-consumer, anti-competitive, and place profits above the law.

9. To combat false and misleading marketing practices, California's False Advertising Law ("FAL") prohibits businesses from making statements that they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes a prohibition on advertisements stating or suggesting that a product is discounted when, in fact, it is not. The FAL considers a sale to be fake—and illegal—when it continues for a period of more than 3 months, *i.e.*, a permanent sale.[6]

10. Similarly, California's Consumer Legal Remedies Act ("CLRA") prohibits "advertising goods or services with the intent not to sell them as advertised" and specifically prohibits, among other things, "false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

11. Defendant's illegal and deceptive advertising must be stopped.

---

[5] Reference pricing is an advertising technique where retailers display a product's current, typically discounted, price next to a higher, regularly offered price for that product. That higher, regularly offered price is known as the "Reference Price."

[6] Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price [. . .] unless the alleged former price was the prevailing market price [. . .] within three months next immediately preceding the publication of the advertisement.").

## PARTIES

12. Plaintiff **Bradford Hogge** purchased one of Defendant's products on February 18, 2023, based on Defendant's false and/or misleading advertisement that the product was discounted from a former or regular price that it was never actually sold at during the relevant period. He is and was at all relevant times domiciled in Santa Monica, California.

13. Plaintiff **Natalie Hilburg** purchased one of Defendant's products on June 16, 2024, based on Defendant's false and/or misleading advertisement that the product was discounted from a former or regular price that it was never actually sold at during the relevant period. She is and was at all relevant times domiciled in Los Angeles, California.

14. Plaintiff **Tatiana Burnett** purchased one of Defendant's products on April 16, 2024, based on Defendant's false and/or misleading advertisement that the product was discounted from a former or regular price that it was never actually sold at during the relevant period. She is and was at all relevant times domiciled in Chula Vista, California.

15. The proposed Class includes current and former California residents who, while domiciled in the state of California and within the applicable statute of limitations period, purchased one or more qualifying products from Defendant Tushy, Inc. that it advertised with false or misleading "discounts."

16. Defendant **Tushy, Inc.** ("Tushy" or "Defendant") is a Delaware corporation with a principal address at: 20 Jay Street, Suite 900, Brooklyn, NY 11201. Tushy manufactures, markets, and sells bidet attachments for toilets and other related products.

17. Plaintiffs are not currently aware of the names and true identities of Does 1-10. Plaintiffs reserve the right to amend this complaint to allege their true names and capacities when this information becomes available. Each Doe defendant is responsible for the damages alleged pursuant to each of the causes of action asserted, either through its own conduct or vicariously through the conduct of others. All further references in this complaint to any of the named Defendants include the fictitiously named Doe defendants.

18. At all times alleged herein, each Defendant was an agent, servant, joint employer, employee, partner, and/or joint venture of every other Defendant and acted within

the scope of their relationship with the others. Moreover, the conduct of every Defendant was ratified by each other Defendant.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed Class are citizens of a state different from that of Defendant.

20. This Court has personal jurisdiction over Defendant. Defendant does business in California. Its products have been marketed and sold to consumers in California with false and misleading "discounts." Defendant's actions have harmed consumers in California. Plaintiffs' claims likewise arose out of Defendant's contacts with this forum. Due to Defendant's actions, Plaintiffs purchased its products in California and were harmed in California.

21. Venue is proper under 28 U.S.C. § 1391(b)(3) and 28 U.S.C. § 1391(d) because Defendant would be subject to personal jurisdiction in this District if this District were a separate State. Defendant markets and sells its products to consumers in this District, has harmed consumers in this District, and the claims of at least one Plaintiff arose out of Defendant's contacts with this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claims occurred" here.

## FACTUAL ALLEGATIONS

### *Tushy Advertises Sales with False and Misleading "Discounts"*

22. Defendant Tushy, Inc. ("Tushy" or "Defendant") advertises, markets, and sells easy-to-install bidet attachments for toilets and other related products directly to consumers.

23. Most, if not all, of Defendant's products are privately branded (i.e., Tushy products), and almost all are sold by Defendant through its website (www.hellotushy.com) or its Amazon storefront (www.amazon.com/tushy).

24. Like many businesses, Defendant often advertises its products for sale with

"discounts" off higher list prices (or "Reference Prices") that it represents to be prices formerly offered to the public on a regular basis for a reasonably substantial period of time. Defendant communicates this in at least five distinct ways.

25. First, the homepage for Defendant's website (i.e., www.hellotushy.com) displays several featured products alongside a bright blue button with the words "ADD TO CART," a Reference Price that has been struck through with a line (e.g., "~~$149~~"), and a purportedly "discounted" price that the product is currently being sold at (e.g., $119"). Clicking this button adds the product to a user's online shopping cart. An example screenshot is provided below:




Wayback Machine – June 16, 2024

26. Second, on individual product pages (e.g., www.hellotushy.com/products/classic-affordable-bidet), currently "discounted" products are shown with additional details and ordering options along with another bright blue "ADD TO CART" button showing a

"discounted" price next to a struck-out Reference Price. Clicking this button also adds the product to a user's online shopping cart.




Wayback Machine – June 14, 2024

27. Third, after clicking on the "ADD TO CART" button for a product, a "CHOOSE OPTIONS" sidebar appears showing the product's name, image, and color options, among other things. This sidebar again shows the Product's currently advertised price next to a struck-out Reference Price, along with another "ADD TO CART" button that will finally add the Product to a customer's cart when clicked on.




Defendant's Website – July 22, 2025

28. Fourth, after clicking on this "ADD TO CART" button, the "CHOOSE OPTIONS" sidebar is replaced with a "CART" sidebar, which once again shows the product added to the customer's online shopping cart with the currently advertised price next to a struck-out Reference Price, but this time also shows the customers calculated savings in bold blue font (e.g., "**Save $32**"). An example screenshot is provided below:




Defendant's Website – July 22, 2025

29. Fifth, on Defendant's checkout page, where customers enter their delivery and payment information, the product is shown with its name, an image, its currently advertised purchase price, and a struck-out Reference Price next what appears to be the image of an archetypal sale price tag. An example screenshot is provided below:




Defendant's Website – July 22, 2025

30. Until recently, numerous products (the "Products") sold by Defendant have been perpetually advertised with purported discounts off struck-out Reference Prices. Because these Products were consistently offered at discounted prices, they were rarely, if ever, sold at the stated Reference Prices, making the advertised "discounts" illusory.

31. In other words, the "discounted" prices advertised by Defendant were actually

the Products' regular prices, and their Reference Prices were fictitious prices used solely to create the illusion of discounts and induce customers to purchase Products they would not otherwise purchase and/or pay higher prices for the Products by manipulating their perceived value relative to the Reference pricing.[7]

32. This practice is known as "false reference pricing."

33. False reference pricing occurs when a seller advertises an artificial, inflated price for the sole purpose of enabling the subsequent offer of a large reduction from that price. 16 C.F.R. § 233.1, subd. (a). In such cases, the "reduced" price is, in reality, just the seller's regular price and the "bargain" being advertised is a false one where the purchaser is not receiving the value he or she expects from the purchase. *Id*.

34. Defendant knew and counted on the fact that reasonable consumers understood these struck-out Reference Prices to represent genuine former prices at which the Products were sold on a regular basis for a reasonably substantial period of time, and that they would therefore receive bona fide discounts in exchange for buying Products sooner rather than later.

35. Defendant also knew and counted on the fact that reasonable consumers understood these struck-out Reference Prices to represent prices that the Products would soon return to, and that they would therefore miss out on bona fide discounts if they bought the Products later rather than sooner.

36. But these Products were practically never sold at their Reference Prices, so purchasers did not get the bona fide discounts that they bargained for.

***Plaintiffs' Counsel's Investigation***

37. To confirm that Tushy perpetually advertised certain Products with discounts off Reference Prices they were practically never sold for (i.e., false reference prices), Plaintiffs' counsel used the Internet Archive's "Wayback Machine" – located at

[7] *Id*.

www.archive.org – to investigate Defendant's pricing history.[8] At the same time, Plaintiff's counsel also visited Defendant's website for 90 days to monitor its pricing.

38. Two named Plaintiffs (Natalie Hilburg and Tatiana Burnett) purchased Products on June 16, 2024, and April 16, 2024, so Plaintiffs' counsel viewed Waybacks of Defendant's website for nearly every day between January 16, 2024 to June 16, 2024, covering both 90-day time windows leading up to their purchases. Because these windows overlapped, the combined period spanned 153 days. In total, Plaintiffs' counsel identified 144 Waybacks for the TUSHY Classic 3.0 and TUSHY Spa 3.0, and 142 Waybacks for the TUSHY Ace (out of 153).[9]

39. The third named Plaintiff (Bradford Hogge) purchased a TUSHY Classic 3.0 on February 18, 2023, so Plaintiffs' counsel also attempted to view Waybacks of Defendant's website for every day during the 90-day period leading up to this – i.e., November 20, 2022, to February 20, 2023. However, Waybacks of Defendant's website are relatively sparse during this period, so Plaintiffs' counsel only found pricing history for the TUSHY Classic 3.0 on 75 days.

40. From November 20, 2022, to February 20, 2023, Waybacks of Defendant's website showing pricing for the TUSHY Spa 3.0 and TUSHY Ace are even sparser, so Plaintiffs' counsel looked for one Wayback per week for each of these Products, but some weeks had no Waybacks.

41. For each Wayback identified above, Plaintiffs' counsel recorded the names of Products advertised therein, their purchase prices, and any struck-out Reference Prices or coupons offered.

42. Finally, starting on October 29, 2024, and ending on February 3, 2025, Plaintiffs' counsel visited Defendant's website each day and saved screenshots of Products

---

[8] The Internet Archive, located at www.archive.org, is an online library that archives web pages as they existed on certain dates. *See* https://archive.org/about/

[9] Prior to January 16, 2024, and going backward to February 22, 2023, Plaintiffs' counsel viewed one Wayback for each Product, except for three weeks during which there were no Waybacks.

advertised there, their purchase prices, and any struck-out Reference Prices.

43. In total, not including dates after November 6, 2024[10], Plaintiffs' counsel viewed historical pricing history for the TUSHY Classic 3.0 on 314 days from November 20, 2022, to November 6, 2024 (a period of 718 days). Over the same period, Plaintiffs' counsel found 243 days of pricing history for the TUSHY Spa 3.0, and 230 days of pricing history for the TUSHY Ace.

44. For Defendant's TUSHY Classic 3.0, Plaintiffs' counsel's investigation confirmed the following:

a. On all 314 days investigated by Plaintiffs' counsel between November 20, 2022 and November 6, 2024, this Product was listed for sale at a "discounted" price alongside a struck-out Reference Price or at full price with an advertised coupon for between 14% to 40% off. Of the 314 days with discounts, 127 days used struck-out Reference Pricing and 11 days used coupons.

b. From November 20, 2022 to June 30, 2024, Defendant listed its TUSHY Classic 3.0 with a struck-out Reference Price of $129 but it appears from Plaintiffs' counsel investigation that it was never sold for more than $99. From July 3, 2024 to September 4, 2024, this Product was listed with a Reference Price of $139 but it appears from Plaintiffs' counsel investigation that it was never sold for more than $109. And from September 7, 2024 to November 6, 2024, this Product was listed with a Reference Price of $149 but it appears from Plaintiffs' counsel investigation that it was never sold more than $119. After November 6, 2024, Defendant continued selling this Product for $119 but stopped advertising it with a higher struck-out Refence Price nearby.

45. For Defendant's TUSHY Spa 3.0, Plaintiffs' counsel's investigation confirmed the following:

a. On all 243 days investigated between November 2, 2022, and November 6, 2024, this Product was listed for sale with a "discounted" price alongside a struck-out

[10] Based on these daily visits, Defendant may have ceased its practice of permanently discounting products after November 6, 2024.

Reference Price or at full price with an advertised coupon for between 14% to 40% off.

b. Specifically, from November 20, 2022, to August 29, 2024, the TUSHY Spa 3.0 had a Reference Price of $159 but was never sold for more than $129. On September 1st and 4th of 2024, this Product was listed with a Reference Price of $151 and sold for $111. And from September 7, 2024, to November 6, 2024, it was listed with a Reference Price of $169 but never sold more than $139.

46. For Defendant's TUSHY Spa 3.0, Plaintiffs' counsel's investigation confirmed the following:

a. On all 230 days investigated between November 20, 2022, and November 6, 2024, this Product was listed for sale with a "discounted" price alongside a struck-out Reference Price or at full price with an advertised coupon for between 14% to 40%.

b. Specifically, from November 20, 2022, to August 29, 2024, on all days investigated except two, the TUSHY Ace had a Reference Price of $599 but was never sold for more than $399. On these two other days investigated, it was either advertised for sale at $539 with a 25% off coupon, resulting in a sale price of $404.25, or for sale at $599 with a 30% off coupon, resulting in a sale price of $419.30. On September 1st and 4th of 2024, this Product was listed with a Reference Price of $599 and sold for $359. And from September 7, 2024 to November 6, 2024, it was again listed with a Reference Price of $599 but not sold more than $399.

47. Example screen captures are provided below:




Wayback Machine – October 13, 2024




Wayback Machine – July 3, 2024




Wayback Machine – August 2, 2023

48. When advertising coupons, Defendant offered 40% off, 30% off, 20% off, or 14% off. When offering the 40% or 30% off coupons, the Products were advertised for sale at their previously struck-out Reference Prices, which resulted in an even steeper illusory discount. When offered with the 20% and 14% off coupons, the Products were listed for sale at their previously advertised "discount" price—not their previously struck-out Reference Prices—so this also resulted in even steeper discounts.

49. In sum, on all but 3 days investigated by Plaintiffs' counsel between November 20, 2022, and November 6, 2024, the TUSHY Classic 3.0 was *always* advertised with a discount of at least $30, on all but 3 days the TUSHY Spa 3.0 was *always* advertised with a discount of at least $30, and on all but 5 days the TUSHY Ace was *always* advertised with a staggering discount of $200 or more when using strike-through Reference Pricing.

50. On information and belief, this has also been true of Defendant's advertisements for as of yet unidentified Products during the relevant period.

51. As of November 7, 2024, Defendant seems to have stopped advertising its Products with perpetual "discounts" off struck-out Reference Prices. However, Defendant did not start selling the Products at their previously struck-out Reference Prices previously

advertised. Rather, it simply continued selling the Products at their "discounted" prices without advertising a higher struck-out Reference Price—indicating that the "discounted" prices are, and always have been, the true sale price of the Products

52. An example screenshot is provided below:




Wayback Machine – November 7, 2024

53. To date, Defendant still does not sell the Products for their previously advertised Reference Prices. An example screenshot is provided below:




Wayback Machine – October 20, 2025

54. Because Defendant derived economic value from its decision to advertise Products with false Reference Pricing, it is reasonable to infer that Defendant stopped advertising struck-out Reference Prices for its Products—i.e., it stopped marketing them as discounted—because it realized a countervailing economic risk associated with violating consumer protection laws.

55. Plaintiffs' counsel also investigated the pricing history of Products sold through Defendant's Amazon storefront using www.camelcamelcamel.com ("Three

Camels").[11] Three Camels is an Amazon price tracker that provides price history charts and price drop alerts for products sold on Amazon.

56. Based on this investigation, Plaintiffs' counsel confirmed the following:

a. Until approximately February 2024, the TUSHY Classic 3.0 was never sold on Amazon for more than $109 but was continuously advertised on Defendant's website with a Reference Price of $129. From then until September 2024, it was continuously advertised on Defendant's website with a Reference Price of $129 or $139 and was never sold on Amazon for more than $120. From then until November 2024, it was continuously advertised on Defendant's website with a Reference Price of $139 or $149 and was never sold on Amazon for more than $134.95. To date, this Product has still never been sold on Amazon for more than $134.95.

b. Until approximately April 2024, the TUSHY Spa 3.0 was never sold on Amazon for more than $140 but was continuously advertised on Defendant's website with a Reference Price of $159. And from then until the November 2024, this Product was never sold on Amazon for more than $152.15 but was consistently advertised on Defendant's website with a Reference Price of $159 or $169.

c. Plaintiff's counsel was unable to locate any pricing history for Defendant's TUSHY Ace on Three Camels.

57. In sum, Plaintiffs' counsel's investigation confirmed that throughout the relevant time period, these Products were also *never* sold by Defendant through Amazon for the Reference Prices advertised on Defendant's website – further confirming that Defendant's Reference Prices were indeed fictitious and its discounts illusory.

***Tushy's Reference Prices Are Fake***

58. On information and belief, Defendant is the manufacturer or owner of its privately branded Products. Further on information and belief, the vast majority of its Products are sold directly to consumers through either its own website or its Amazon storefront.

[11] Plaintiffs' counsel was unable to find archives for Defendant's pricing history on Amazon using the Wayback Machine.

59. As Defendant is the manufacturer and/or owner of its privately branded Products, it is also the primary seller of the Products and sets prevailing market prices for the Products.

60. This conclusion was borne out in Plaintiffs' counsel's investigation. For example, as of July 9, 2025, the TUSHY Classic 3.0 has 18,457 reviews on Defendant's website and 8,751 reviews on its Amazon TUSHY store, while other third-party resellers have little to no sales reviews.[12]

61. The only exception to this was www.walmart.com, which as of October 20, 2025, had 10,437 reviews for the TUSHY Classic 3.0 Bidet. However, the vast majority of those reviews were identified with a disclaimer stating: "Review from **hellotushy.com**." When Walmart's reviews are filtered to show "Verified purchases only," meaning "[t]his reviewer bought this item from Walmart online or in-store. Walmart showed *only* 8 reviews as of October 20, 2025.




https://www.walmart.com/reviews/product/169456798?vp=true – October 20, 2025

62. Thus, Plaintiffs' counsel's investigation revealed that for several years, at least, the Reference Prices used by Defendant did not represent its own bona fide former prices,

[12] *See* https://wayofbeing.co/products/tushy-classic-3-0 (1 review as of October 20, 2025); https://www.thewastelessshop.com/products/tushy-classic-3-0 (no reviews as of October 20, 2025); https://homeoutletdirect.com/products/tushy-classic-3-0 (no reviews as of October 20, 2025); https://plasticfreepursuit.com/products/tushy-classic-3-0 (no reviews as of October 20, 2025).

prevailing market prices, comparison prices, or true market values for the Products anywhere they were sold, rendering Defendant's advertised "discounts" off those prices illusory in all respects.

63. Defendant's Reference Prices were simply made-up prices used for the sole purpose of enabling a subsequent offer of a large reduction from those prices.

***Tushy's Advertisements Violate California Law***

64. California's False Advertising Law ("FAL") prohibits any business from making statements concerning its products or services that it knows or should know to be untrue or misleading. *See* Cal. Bus. & Prof. Code § 17500. This prohibition includes false or misleading statements suggesting that a product is discounted from a bona fide former price when, in reality, the former price is a fictitious one. *See e.g.*, Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price [. . .] within three months.").

65. Further, California's Consumer Legal Remedies Act ("CLRA") prohibits "[a]dvertising goods or services with the intent not to sell them as advertised," as well as "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9) & (13).

66. California's Unfair Competition Law ("UCL") generally outlaws "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

67. Moreover, the Federal Trade Commission's regulations on pricing confirm that Defendant's scheme is unfair and deceptive. These regulations prohibit false or misleading "former price comparisons," such as making up "an artificial, inflated price … for the purpose of enabling the subsequent offer of a large reduction" off that price. 16 C.F.R. § 233.1. They also prohibit false or misleading "retail price comparisons" that falsely suggest that the seller is "offer[ing] goods at prices lower than those being charged by others for the same merchandise" when this is not the case. 16 C.F.R. § 233.1.

68. As detailed above, Defendant continuously made false and misleading statements about its Reference Prices throughout the relevant period.

69. Specifically, for a prolonged period, Defendant continuously advertised prices for certain Products as being "discounted" from struck-out Reference Prices, which it represented to those Products' former or regular prices. However, except for 3 days investigated, Defendant never actually sold these Products for their Reference Prices during this period.

70. Nor did the Reference Prices for Defendant's Products represent bona fide prevailing market prices or true market values because they were rarely—if ever—sold by third-party resellers at those prices.

71. Reasonable consumers reasonably understood these struck-out Reference Prices to represent bona fide former prices, prevailing market prices, or true market values, which Defendant used against them to induce them into purchasing Products they would not have otherwise purchased and/or paying higher prices than they would have otherwise paid for the Products.

72. Defendant's false reference pricing scheme is patently false, misleading, unfair, and illegal. As described above, Defendant advertises fake discounts from false Reference Prices, which induces more consumers to purchase the Products and pay higher prices for the Products, resulting in substantial economic injury to consumers.

73. Reasonable consumers who rely on Defendant to provide truthful representations about its Products' prices, and who make important purchasing decisions based on those representations, cannot reasonably avoid this injury, and Defendant's false discounts offer no countervailing benefits to the public. Misrepresenting the Products' prices, and reductions from those prices, solely benefits Defendant, enabling it to sell more Products at higher prices than it otherwise could, while harming consumers and honest competitors alike.

74. As such, Defendant's business practices were unfair, misleading, false, and deceptive, and violated California's laws and important public policies aimed at preventing the harms caused by such practices.

***Tushy's False Reference Pricing Scheme Harms Consumers***

75. Empirical research indicates that "[i]nflated reference prices can […] increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999). These retailer-positive outcomes result from several distinct types of inferences consumers make about advertised reference prices. *See* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118-22 (1994).

76. *First*, consumers infer that "the 'regular' price reflects the product's intrinsic value, and therefore is a fair price for the product." *Id.*, at p. 119. "If the consumer wished to purchase a product of the quality indicated by the retailer's regular price, he or she might be induced to take advantage of the advertised savings to do so." *Id.*

77. *Second*, consumers infer that "the retailer's 'regular' price reflects the prevailing competitive price and therefore is the market price of the product." *Id.* "Under the second inference, consumers may believe that rational retailers, aware of market conditions, set and adjust their regular prices so as to be competitive in that market." *Id.*, at pp. 118-19. "The direct effect of this inference is to limit active consumer search for competitor price information." *Id.*, at p. 119.

78. *Third*, consumers infer that "the 'regular' price becomes the penalty price paid only by those unable to wait even the short time for the retailer's frequent sales events." *Id.*, at p. 122. In other words, this inference creates a sense of urgency among consumers to buy now.

79. In a study measuring the effects of false reference pricing on consumers' purchasing behavior, "[p]articipants were more likely to purchase an item when the selling price appeared discounted" from made-up original prices. Jennie Huang, *The Trill of the Deal: Quantifying the Price of Perceived Discounts and Mark-ups*, manuscript, p. 11

(2018). "Moreover, the larger the perceived discount, the higher the purchasing rate." *Id.*

80. It was observed that a perceived discount of 10% led to a 3.8 percentage point increase in the purchasing rate, while a perceived discount of 20% led to a 6% increase, and a perceived discount of 40% led to a 10.7 percentage point increase. *Id.*, pp. 11 & 38, Table A1.

81. Using these tactics, Defendant has led reasonable consumers to believe that its struck-out Reference Prices represented bona fide former prices or prevailing market prices for the Products. In other words, reasonable consumers reasonably believed that Defendant's Reference Prices represented prices at which the Products were recently sold and will soon be sold again.

82. Defendant has also led reasonable consumers to believe that its struck-out Reference Prices represented the prevailing market prices or true market values of its Products. In other words, reasonable consumers reasonably believed that Defendant's Reference Prices represent amounts that consumers normally must pay for the Products if purchased elsewhere.

83. Thus, reasonable consumers reasonably concluded that by purchasing Products from Defendant specifically, and sooner rather than later, they would receive—at the advertised discount—Products with prevailing market prices and true market values equal to the struck-out Reference Prices. For example, for a Product purportedly marked down to $399.00 from $599.90, reasonable consumers expected to receive a $200.00 discount off a bona fide former or regular price and that the Product had a true market value that was $200.00 higher than what they spent.

84. Reasonable consumers then *bought* Defendant's products expecting to receive the benefit of their bargain—a discount in the *full* amount being advertised—which they reasonably feared they would lose access to at any given moment if they waited to make their purchases.

85. However, as discussed above, for a prolonged period, Defendant practically never sold certain Products for their advertised Reference Prices, and neither did any third-

party resellers.

86. Thus, Plaintiffs' and Class Members' reasonable expectations were *not* met. Instead of receiving significant discounts as advertised, Plaintiffs and Class Members received little to no discounts because the "discounted" prices were actually the regular prices. So, instead of receiving Products with market values equal to Defendant's Reference Prices, they received items worth *far less*.

87. Defendant's illegal advertisements have harmed consumers by depriving them of their reasonably expected bargains.

88. Defendant is incentivized to engage in this illegal conduct because consumers who are presented with discounts are substantially more likely to make purchases: "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase,"[13] while, "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount," and "80% [of consumers] said they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[14]

89. Similarly, when consumers believe that an offer is expiring soon, it creates a sense of urgency that makes them more likely to buy a product and less likely to comparison shop or make purchases from other retailers.[15]

90. Defendant's advertisements harm consumers by inducing them, based on false or misleading information, to make purchases they would not have otherwise made.

---

[13] https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/

[14] RetailMeNot Survey: Deals and Promotional Offers Drive Incremental Purchases Online, Especially Among Millennial Buyers (prnewswire.com)

[15] https://cxl.com/blog/creating-urgency/ (addition of a countdown timer increased conversion rates from 3.4%-10%); Dynamic email content leads to 400% increase in conversions for Black Friday email | Adestra (uplandsoftware.com) (400% higher conversation rate for ad with countdown timer); *see also* Dhruv Grewal & Larry D. Compeau, Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

91. Further, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, *supra*, at p. 66. One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price." *Id*.

92. According to this research, Defendant's false and misleading advertisements artificially increased consumer demand for its Products, and their willingness to pay higher prices for the Products.

93. So instead of paying *lower* prices for the Products, as they believed, consumers have paid *higher* prices for the Products than they would have absent the misrepresentations and falsities described above.

***Plaintiffs Were Misled by Tushy's Advertisements***

94. On February 18, 2023, Plaintiff Bradford Hogge purchased one (1) TUSHY Classic 3.0 – Bamboo. His email receipt shows that this TUSHY Classic 3.0 – Bamboo was priced at $99.00, and that he received an additional 10% discount off this price.

95. Mr. Hogge recalls that, at the time of his purchase, Defendant advertised that the TUSHY Classic 3.0 was significantly discounted from its purported former or regular price, as indicated by a higher struck-out Reference Price found on Defendant's homepage.

96. While the Wayback Machine contains no relevant archived pages for February 18, 2023, it confirms that one day before Mr. Hogge's purchase, and two days after, the TUSHY Classic 3.0 was advertised with a price of $99 next to a higher struck-out Reference Price of ~~$129~~.

97. Further, as explained above, for at least 75 days of Waybacks of Defendant's website investigated by Plaintiffs' counsel over the 90-day period leading up to Mr. Hogge's purchase date advertised the TUSHY Classic 3.0 for sale at $99 or less.

98. Mr. Hogge believed that the advertised Reference Price represented prices that

other customers had to pay for the same Product prior to his purchase, and he further believed that Defendant would soon charge the struck-out Reference Price for the Product again.

99. Mr. Hogge read and relied on these representations from Defendant's website—on its homepage, in his online shopping cart, and the checkout page—that the Products were being sold to him at a temporary discount from its former or regular price (i.e., Reference Price).

100. Thus, Mr. Hogge reasonably believed that he was receiving a substantial discount off the former or regular price charged for the Product, that he was receiving a Product with substantially higher market values than the price he paid for it, and that he would miss out on the benefit of this "bargain" if he did not purchase the Product right away.

101. Mr. Hogge would not have made his purchase when he did if not for Defendant's representations and falsities described above. If he had been aware of the fact that Defendant's Products were *always* on sale, and that the discount being offered to him was near-permanent, then he would not have made the purchase when he did and would have continued comparison shopping for competing options or waited for a legitimate and/or deeper discount from Defendant, or not even purchased from Defendant at all.

102. On June 16, 2024, Plaintiff Natalie Hilburg purchased one (1) TUSHY Classic 3.0 – Platinum. Her email receipt shows that this TUSHY Classic 3.0 – Platinum was priced at $99.00.

103. Ms. Hilburg recalls that, at the time of her purchase, Defendant advertised that the TUSHY Classic 3.0 was significantly discounted from its purported former or regular price, as indicated by a higher struck-out Reference Price found on Defendant's homepage.

104. The Wayback Machine confirms that on the day of Ms. Hilburg's purchase, the TUSHY Classic 3.0 was advertised with a price of $99 next to a higher struck-out Reference Price of ~~$129~~. A screenshot of Defendant's homepage on June 16, 2024, as obtained from the Wayback Machine, is provided below:




Wayback Machine – June 16, 2024

105. Before purchasing the Product, Ms. Hilburg planned to take a trip to Japan where bidets are commonplace, which sparked her interest in purchasing one. She quickly found Defendant's Product advertised with a discount and felt pressured to make the purchase right away because she believed the Product could return to its struck-out Reference Price at any time.

106. Ms. Hilburg believed that the advertised Reference Price represented prices that other customers had to pay for the same Product prior to her purchase, and she further believed that Defendant would soon charge the struck-out Reference Price for the Product again.

107. Ms. Hilburg read and relied on these representations from Defendant's website—on its homepage, in her online shopping cart, and the checkout page—that the Products were being sold to her at a temporary discount from its former or regular price (i.e., Reference Price).

108. Thus, Ms. Hilburg reasonably believed that she was receiving a substantial discount off the former or regular price charged for the Product, that she was receiving a Product with substantially higher market values than the price she paid for it, and that she would miss out on the benefit of this "bargain" if she did not purchase the Product right away.

109. Ms. Hilburg would not have made her purchase when she did if not for Defendant's representations and falsities described above. If she had been aware of the fact that Defendant's Products were *always* on sale, and that the discount being offered to her was near-permanent, then she would not have made the purchase when she did and would have continued comparison shopping for competing options or waited for a legitimate

discount from Defendant, or not even purchased from Defendant at all.

110. On April 16, 2024, Plaintiff Tatiana Burnett purchased one (1) TUSHY Classic 3.0 – Bamboo and one (1) TUSHY Ottoman – Bamboo / Original. Her email receipt shows that the TUSHY Classic 3.0 was priced at $99.00 and the TUSHY Ottoman was priced at $59.00, and that she received a 15% discount off those prices in the amount of $-23.70.

111. Ms. Burnett recalls that, at the time of her purchase, Defendant advertised that the TUSHY Classic 3.0 was significantly discounted from its purported former or regular price, as indicated by a higher struck-out Reference Price found on Defendant's homepage.

112. The Wayback Machine confirms that on the day of Ms. Burnett's purchase the TUSHY Classic 3.0 was advertised with a price of $99 next to a higher struck-out Reference Price of ~~$129~~. A screenshot of Defendant's homepage on April 16, 2024, as obtained from the Wayback Machine, is provided below:




Wayback Machine – April 16, 2024

113. Ms. Burnett believed that the advertised Reference Price represented prices that other customers had to pay for the same Product prior to her purchase, and she further believed that Defendant would soon charge the struck-out Reference Price for the Product again.

114. Ms. Burnett read and relied on these representations from Defendant's website—on its homepage, in her online shopping cart, and the checkout page—that the Products were being sold to her at a temporary discount from its former or regular price (i.e., Reference Price).

115. Thus, Ms. Burnett reasonably believed that she was receiving a substantial discount off the former or regular price charged for the Product, that she was receiving a Product with substantially higher market values than the price she paid for it, and that she would

miss out on the benefit of this "bargain" if she did not purchase the Product right away.

116. Ms. Burnett would not have made her purchase when she did if not for Defendant's representations and the falsities described above. If she had been aware of the fact that Defendant's Products were *always* on sale, and that the discount being offered to her was near-permanent, then she would not have made the purchase when she did and would have continued comparison shopping for competing options or waited for a legitimate discount from Defendant, or not even purchased from Defendant at all.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action on behalf of themselves and as a class action on behalf of members of the following defined Class:

- All persons who, while in the state of California and within the applicable statute of limitations period, purchased one or more Products from Defendant that were advertised with discounts from Reference Prices or with coupons that were not bona fide former prices or prevailing market prices.

118. **Numerosity and Ascertainability.** The proposed Class contains members so numerous that a separate joinder of each member of the class is impractical. There are thousands or perhaps even tens of thousands of class members, each of whom can be identified through Defendant's sales records and/or through public notice.

119. **Existence and Predominance of Common Issues.** Common questions of law and fact exist as to all Class Members, which predominate over issues affecting individual Class Members, including, but not limited to:

a. Whether Defendant falsely advertised Reference Prices for its Products as being former prices for those Products;

b. Whether Defendant falsely advertised Reference Prices for its Products as being prevailing market prices for those Products;

c. Whether the purported discounts advertised by Defendant accurately reflected any actual discounts or savings off bona fide former prices or prevailing market prices;

d. Whether Defendant made any other deceptive, false, and/or misleading

statements in its advertisements for the Products;

e. Whether Plaintiffs and Class Members reasonably relied on Defendant's deceptive, false, and/or misleading advertisements when purchasing its Products;

f. Whether Defendant's actions constitute violations of California's False Advertising Law, Consumer Legal Remedies Act, and/or Unfair Competition Law;

g. Whether Defendant's conduct constitutes violation any other federal and/or California regulations regarding deceptive, false, and/or misleading advertising; and

h. Whether Plaintiffs and Class Members sustained damages as a result of any of the aforementioned violations, and, if so, the proper measure of their damages, including interest, penalties, attorneys' fees, costs, and equitable relief.

120. **Typicality.** Plaintiffs' claims are typical of the proposed Class. Plaintiffs, like all other Class Members, purchased one or more qualifying Products from Defendant while advertised on its website as being discounted from Reference Prices that were not bona fide former prices or prevailing market prices for the Products.

121. **Adequacy.** There are no material conflicts of interest between Plaintiffs and the proposed Class that would make class certification inappropriate. Plaintiffs will fairly and adequately protect the interests of the proposed Class, and they understand their obligation to inform the Court of any relationships, conflicts, or differences with any Class Member(s). Moreover, Plaintiffs have retained competent attorneys as proposed class counsel, who are well-versed in the rules governing class action discovery, certification, and settlement, and who will vigorously assert the claims of all Class Members.

122. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this dispute. The damages incurred by individual Class Members, while significant, are small in comparison to the burden and expense of individualized litigation over Defendant's conduct. Further, the court system would be overwhelmed by individual lawsuits if all Class Members separately sought redress. Such individualized litigation increases the delay and expense to all parties, and to the court system, due to the complex legal and factual issues of this case.

123. Individualized litigation also creates the potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; it allows the hearing of claims that might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

124. Plaintiffs contemplate providing individual notice to all members of the Class defined above as identified through Defendant's sales records and/or through public notice.

## <u>CAUSES OF ACTION</u>

## <u>FIRST CAUSE OF ACTION</u>

### Violation of California's False Advertising Law

### ***Bus. & Prof. Code §§ 17500, et seq.***

### (On Behalf of Plaintiffs and the Class)

125. Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

126. Plaintiffs bring this cause of action on behalf of themselves and all members of the Class.

127. Bus. & Prof. Code § 17500 provides that "[i]t is unlawful [. . .] with intent directly or indirectly to dispose of real or personal property [. . .] to make or disseminate [. . .] any advertising device [. . .] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or [. . .] with the intent not to sell that personal property [. . .] so advertised at the price stated therein, or as so advertised."

128. Bus. & Prof. Code § 17501 further provides: "No price shall be advertised as a former price of any advertised thing, *unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding* the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." (Emphasis added).

129. As alleged more fully above, Defendant continuously advertised Products on

its website with prices that were purportedly discounted from nearby struck-out Reference Prices.

130. Plaintiffs and Class Members reasonably understood Defendant's Reference Prices to represent discounts from prices formerly and regularly offered to the public on a regular basis for a reasonably substantial period of time, and that they would soon have to pay the Reference Prices again if they waited to purchase the Products.

131. However, Defendant did not formerly or regularly charge the advertised Reference Prices for its Products during the relevant period. Thus, unbeknownst to Plaintiffs and the Class, the Reference Prices advertised by Defendant as being former or regular prices were not the prevailing market prices for its Products.

132. Defendant's advertisements did nothing to correct Plaintiffs' and Class Members' reasonable but mistaken beliefs that the Reference Prices represented former or prevailing market prices, such as indicating whether, when, or where the Reference Prices were ever actually paid for the Products.

133. Defendant's representations about the former and/or regular prices of its Products were and continue to be untrue and misleading.

134. This practice of advertising Products at continuously discounted prices along with made-up Reference Prices that are passed off as former or regular prices, but are in fact materially greater than actual prevailing market prices for the Products, constitutes an untrue and misleading advertising practice in violation of California's False Advertising Law.

135. Thus, Defendant violated, and continues to violate, Sections 17500 and 17501 Bus. & Prof. Code. As a result of Defendant's misrepresentations, Plaintiffs and Class Members have been induced to purchase Products they would not have otherwise purchased and/or pay higher prices than they would have otherwise paid for the Products.

136. Defendant's misrepresentations were intended to induce reliance, and Plaintiffs saw, read, and reasonably did rely on them when deciding to purchase Defendant's Products. Thus, Defendant's misrepresentations were a substantial factor in each Plaintiff's

decision to purchase the Products.

137. In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them to be important in deciding whether to buy the Products.

138. Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because: (a) if they had known the truth, they would not have purchased the Products when they did, and would have continued searching for competing products instead; (b) they overpaid for the Products because they believed the Products had greater market values; and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than what was promised to them.

139. Defendant's acts and omissions are also injurious to the general public because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have injured other persons and, if continued or resumed, have the capacity to injure yet more persons.

140. Plaintiffs, on behalf of themselves and all members of the proposed Class, request that this Court order Defendant to restore money to Plaintiffs and Class Members.

## SECOND CAUSE OF ACTION

**Violation of California's Consumer Legal Remedies Act**

***Cal. Civ. Code §§ 1750, et seq.***

**(On Behalf of Plaintiffs and the Class)**

141. Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

142. Plaintiffs bring this cause of action on behalf of themselves and all members of the Class.

143. Plaintiffs and Class Members are "consumers" as that term is defined by Cal.

Civ. Code § 1761(d). "'Consumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." *Id*.

144. Plaintiffs and Class Members have engaged in "transactions" with Defendant as that term is defined by Cal. Civil Code § 1761(e). "'Transaction' means an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id*.

145. Plaintiffs and Class Members purchased "goods" from Defendant as that term is defined by Cal. Civil Code § 1761(a). "'Goods' means tangible chattels bought or leased for use primarily for personal, family, or household purposes [. . .]" *Id*.

146. Defendant violated, and continues to violate, numerous provisions of Section 1770(a) of the California Civil Code.

147. Defendant violated, and continues to violate, Section 1770(a)(5) of the California Civil Code by representing that Products offered for sale on its website have characteristics or benefits that they do not have. Specifically, Defendant represents that the value of its Products is greater than in reality by making up and advertising inflated Reference Prices for the sole purpose of enabling subsequent offers of large reductions from those prices.

148. Defendant violated, and continues to violate, Section 1770(a)(9) of the California Civil Code by advertising its Products by advertising them as possessing significantly greater prevailing market prices or market values than in reality.

149. Finally, Defendant violated, and continues to violate, section 1770(a)(13) by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions on its website, including by: (1) advertising discounts and savings that are exaggerated or nonexistent; and/or (2) misrepresenting that the discounts and savings are unusual, when in fact they are regularly available.

150. Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiffs and other reasonable consumers who are members of the proposed Class. Defendant

knew or should have known, through the exercise of reasonable care, that these statements were untrue and misleading.

151. Defendant's misrepresentations were intended to induce reliance, and Plaintiffs saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

152. In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them to be important in deciding whether to buy the Products.

153. Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because: (a) if they had known the truth, they would not have purchased the Products when they did, and would have continued searching for competing products instead; (b) they overpaid for the Products because they believed the Products had greater market values; and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than the promised market values.

154. Defendant's acts and omissions are also injurious to the general public because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have injured other persons and, if continued or resumed, have the capacity to injure yet more persons.

155. Plaintiffs seek damages and, alternatively, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiffs' equitable claims are different than and do not require the same showings as Plaintiffs' legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such

requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

156. Finally, the remedies at law available to Plaintiffs and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

157. CLRA § 1782 NOTICE. Defendant does not have a principal place of business in California and Plaintiffs' counsel could not identify a registered agent for Defendant in California. So, on October 29, 2025, a CLRA demand letter was sent to Defendant's principal address—20 Jay Street, Suite 900, Brooklyn, NY 11201—via certified mail (return receipt requested), which provided notice to Defendant of its violations of the CLRA, and demanded that Defendant correct the unlawful, unfair, false, and/or deceptive practices complained of herein on behalf of Plaintiffs and the Class.

158. Identical CLRA demand letters were also sent on October 29, 2025, via certified mail (return receipt requested) to Defendant's registered agents in Delaware and New York. Defendant's registered agent in Delaware is: A Registered Agent, Inc., 8 The Green St., Ste. A, Dover, DE 19901. Defendant's registered agent in New York is: The Corporation, 72 Devoe St., Brooklyn, NY 11212.

159. Plaintiffs' October 29, 2025, CLRA demand letter included, among other things, a demand for cure refunding: (1) the full amount of the discount that was advertised to them; and (2) the full amounts of all discounts advertised to all other persons who, while in the state of California and within the applicable statute of limitations period, purchased one or more Products from Defendant that were advertised with discounts from Reference Prices or with coupons that were not bona fide former prices or prevailing market prices.

160. On November 1, 2025, Plaintiffs' CLRA demand letter was successfully delivered to Defendant's principal address at 20 Jay Street, Suite 900, Brooklyn, NY 11201.

161. On November 1, 2025, Plaintiffs' CLRA demand letter was successfully delivered to Defendant's registered agent in New York: The Corporation, 72 Devoe St., Brooklyn, NY 11212.

162. On November 3, 2025, Plaintiffs' CLRA demand letter was successfully delivered to Defendant's registered agent in Delaware: The Corporation, 72 Devoe St., Brooklyn, NY 11212.

163. Defendant had 30 days from receipt (i.e., December 1, 2025, or December 3, 2025) to respond to Plaintiffs' CLRA demand letter.

164. As of December 5, 2025, Defendant has failed to respond to Plaintiffs' CLRA

165. demand letter. As such, Defendant has failed to adequately correct, repair, replace, or otherwise rectify the issues raised therein within the required statutory period.

166. Plaintiffs, on behalf of themselves and all other members of the Class, seek actual, punitive, and statutory damages, as appropriate against Defendant, and an award of costs and reasonable attorneys' fees pursuant to Cal. Civ. Code § 1780(e).

167. Pursuant to Cal. Civ. Code § 1780(d), a declaration of venue was filed on November 4, 2025.

**<u>THIRD CAUSE OF ACTION</u>**

**Violation of California's Unfair Competition Law**

***Bus. & Prof. Code §§ 17200, et seq.)***

**(On Behalf of Plaintiffs and the Class)**

168. Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

169. Plaintiffs bring this cause of action on behalf of themselves and all members of the Class.

170. Defendant has violated California's Unfair Competition Law ("UCL") by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

***The "Unlawful" Prong***

171. Defendant engaged in unlawful conduct by violating the FAL and CLRA, as alleged above and incorporated herein. In addition, Defendant engaged in unlawful conduct by violating the Federal Trade Commission Act ("FTCA"). The FTCA prohibits "unfair or

deceptive acts or practices in or affecting commerce" and prohibits the dissemination of false advertisements. 15 U.S.C. § 45(a)(1), 15 U.S.C. § 52(a). As the FTC's regulations make clear, Defendant's false referencing pricing scheme violates the FTCA. 16 C.F.R. § 233.1, § 233.2.

***The "Deceptive" or "Fraudulent" Prong***

172. As alleged in detail above and incorporated herein, Defendant's representations that its Products were discounted from made-up Reference Prices there were passed off as former or prevailing market prices for the Products, that customers were receiving bona fide discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the advertised Reference Prices, were untrue and misleading.

173. Defendant's representations were likely to deceive the public and did in fact deceive Plaintiffs and other reasonable consumers who are members of the proposed Class. Defendant knew or should have known, through the exercise of reasonable care, that its representations about Reference Prices for the Products were untrue and/or misleading.

***The "Unfair" Prong***

174. As alleged in detail above, Defendant committed "unfair" acts by falsely advertising that its Products were temporarily discounted former or regular prices for the Products, that customers were receiving bona fide discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the advertised Reference Prices, when none of this was true.

175. Defendant violated established public policy by violating the CLRA, the FAL, and the FTCA, as alleged in detail above and incorporated herein. The unfairness of this practice is tethered to legislatively declared policies including but not limited to the CLRA and FAL.

176. These unfair acts caused Plaintiffs and members of the proposed Class to buy Products they otherwise would not have bought, pay more for the Products than they otherwise would have paid, and/or be deprived of their expectancy interest in receiving Products

with higher advertised market values than the prices they paid for them.

177. The harm to Plaintiffs and Class Members greatly outweighs any public utility from Defendant's conduct. Their injuries were not outweighed by any countervailing benefits to consumers or competition, as the general public derives no utility from being lied to about receiving discounts off made-up Reference Prices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the untrue and misleading conduct described herein, such as offering bona fide discounts that are limited in time and advertising Reference Prices that were—in fact—formerly offered to the public on a regular basis for a reasonably substantial period of time.

***The Class Was Harmed***

178. For each prong, Defendant's misrepresentations were intended to induce reliance, and Plaintiffs did in fact see, read, and reasonably rely on them when deciding to purchase Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

179. Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them to be important in deciding whether to buy the Products.

180. Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because: (a) if they had known the truth, they would not have purchased the Products when they did, and would have continued searching for competing products instead; (b) they overpaid for the Products because they believed the Products had greater market values; and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than the promised market values.

181. Defendant's acts and omissions are also injurious to the general public because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have

injured other persons and, if continued or resumed, have the capacity to injure yet more persons.

182. Plaintiffs seek damages and, alternatively, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiffs' equitable claims are different than and do not require the same showings as Plaintiffs' legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

183. Plaintiffs seek damages and, alternatively, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiffs' equitable claims are different than and do not require the same showings as Plaintiffs' legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

184. Finally, the remedies at law available to Plaintiffs and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A. For an Order:

a. Certifying the Class;

b. Appointing Plaintiffs as representatives of the Class;

c. Appointing Plaintiffs' counsel as Class Counsel;

B. For actual and liquidated damages according to proof at trial;

C. For restitution and disgorgement of all profits and unjust enrichment;

D. For statutory and civil penalties and special damages, according to proof at trial;

E. For pre- and post-judgment interest on monetary damages;

F. For reasonable attorneys' fees and costs and expert fees and costs as allowed by law; and

G. For such other relief as this Court deems just and proper.

Dated: December 8, 2025

Respectfully submitted,
**KING & SIEGEL LLP**

By: ______________________
Brent R. Boos
Elliot J. Siegel
Attorneys for Plaintiffs and
the Putative Class